LIU, J., Concurring.
The trial court in this case denied defendant’s objection to the prosecutor’s peremptory strikes of all three black prospective jurors with the following statement: “Well, the court finds that no discriminatory intent is inherent in the explanations, and the reasons appear to be race neutral, and on those grounds the court will deny the Wheeler motion.” Because defendant has not shown that it was more likely than not that the strikes were racially motivated, I agree that his claim must be denied. I cannot agree, however, with aspects of today’s opinion that improperly defer to the trial court’s ruling and, in so doing, fail to evaluate defendant’s claim in the manner that high court precedent requires.
Batson v. Kentucky (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (Batson) set forth a three-step framework for evaluating a claim that a peremptory strike was based on race. “First, the defendant must make out a prima facie case ‘by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.’ [Citation.] Second, once the defendant has made out a prima facie case, the ‘burden shifts to the State to explain adequately the racial exclusion’ by offering permissible race-neutral justifications for the strikes. [Citations.] Third, ‘[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.’ ” (Johnson v. California (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410], fn. omitted *1059 (Johnson).) In order to prevail, the defendant must show that “it was more likely than not that the challenge was improperly motivated.” (Id., at p. 170.)
The present case involves Batson's third step. Ordinarily, an appellate court must review the denial of a Batson motion at the third step with deference to the trial court. (See Snyder v. Louisiana (2008) 552 U.S. 472, 477 [170 L.Ed.2d 175, 128 S.Ct. 1203] (Snyder); Batson, supra, 476 U.S. at p. 98, fn. 21.) This rule of deference is warranted because Batson's third-step inquiry often involves evaluation of “whether the prosecutor’s demeanor belies a discriminatory intent.” (Snyder, at p. 477.) In addition, if the prosecutor has invoked a juror’s demeanor as the reason for a strike, the Batson inquiry requires evaluation of “whether the juror’s demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor.” (Ibid.) “[T]hese determinations of credibility and demeanor lie ‘ “peculiarly within a trial judge’s province,” ’ [citation] . . . .” (Ibid.)
However, deference is unwarranted “when a trial court fails to make explicit findings or to provide any on-the-record analysis of the prosecution’s stated reasons for a strike.” (People v. Williams (2013) 56 Cal.4th 630, 717 [156 Cal.Rptr.3d 214, 299 P.3d 1185] (Williams) (dis. opn. of Liu, J.).) In such circumstances, “a reviewing court has no assurance that the trial court has properly examined ‘all of the circumstances that bear upon the issue’ of purposeful discrimination.” (Ibid., quoting Snyder, supra, 552 U.S. at p. 478; see U.S. v. Rutledge (7th Cir. 2011) 648 F.3d 555, 559 [“if there is nothing in the record reflecting the trial court’s decision, then there is nothing to which we can defer”].) In this case, the trial court’s statement that “no discriminatory intent is inherent in the explanations, and the reasons appear to be race neutral ...” does not indicate that it conducted the thorough and careful inquiry at Batson's third step exemplified by the high court’s decisions in Snyder and Miller-El v. Dretke (2005) 545 U.S. 231 [162 L.Ed.2d 196, 125 S.Ct. 2317] (Miller-El). By erroneously deferring to the trial court’s ruling, this court has once again effectuated “the denial of [a] defendant’s Batson claim despite the fact that no court, trial or appellate, has ever conducted a proper Batson analysis.” (Williams, at p. 700 (dis. opn. of Liu, J.).)
I recently explained in Williams that our deference to Batson rulings unaccompanied by explicit findings or analysis falls on the wrong side of a split of authority on the correct approach to appellate review at Batson's third step. (See Williams, supra, 56 Cal.4th at pp. 709-715 (dis. opn. of Liu, J.) [reviewing state and federal case law refusing to accord deference to unexplained Batson rulings, including U.S. v. McAllister (6th Cir. 2012) 693 F.3d 572, 581-582, U.S. v. Rutledge, supra, 648 F.3d at p. 559, Coombs v. Diguglielmo (3d Cir. 2010) 616 F.3d 255, 261-265, and Green v. LaMarque (9th Cir. 2008) 532 F.3d 1028, 1031].) In this opinion, I show how this *1060 unwarranted deference results in judicial inquiry that falls short of what is required in a proper Batson analysis. I also trace the origins of our erroneous doctrine and discuss the unfair and counterproductive consequences of our approach. For some time now, our jurisprudence has not demanded that trial courts or reviewing courts demonstrate a truly reasoned effort to evaluate Batson claims in light of all relevant circumstances bearing on the issue of. purposeful discrimination. And the results, which I document in another opinion filed today, are quite remarkable: In the 102 cases where this court has addressed a Batson claim over the past 20 years, we have found Batson error only once—and that was 12 years ago. (See People v. Harris (2013) 57 Cal.4th 804, 885-886, 892-898 (conc. opn. of Liu, J.).)
Because high court precedent has consistently recognized the manifold harms of racial discrimination in jury selection and has accordingly required more careful and thorough inquiry than our case law provides, I respectfully disagree with the deferential framework that this court continues to apply in reviewing unexplained Batson rulings on appeal.
I.
Reciting our precedent, today’s opinion says: “ ‘ “Review of a trial court’s denial of a Wheeler/Batson motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] ‘We review a trial court’s determination regarding the sufficiency of a prosecutor’s justifications for exercising peremptory challenges “ ‘with great restraint.’ ” [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court’s ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]’ ” (People v. Lenix (2008) 44 Cal.4th 602, 613-614 [80 Cal.Rptr.3d 98, 187 P.3d 946].)’ ([People v. Vines (2011)] 51 Cal.4th 830, 848 [124 Cal.Rptr.3d 830, 251 P.3d 943].)” (Maj. opn., ante, at p. 1048.) So far so good: Deference is appropriate where the trial court makes “a sincere and reasoned effort” to evaluate the prosecutor’s stated reasons for striking a minority juror.
I have no doubt the trial court in this case was sincere. But the record provides no basis for us to conclude that the trial court made a reasoned effort to analyze the prosecutor’s explanations for the strikes. There is no reasoning in the trial court’s statement that “no discriminatory intent is inherent in the explanations, and the reasons appear to be race neutral.” Moreover, when defense counsel noted that “[Juror No. 12] is also unmarried” in response to the prosecutor’s assertion that he struck prospective juror M.H. in part because “[M.H.] is single,” the trial court was “[apparently *1061 confused by counsel’s remark” and did not probe the comparison. (Maj. opn., ante, at p. 1047; see People v. Lenix, supra, 44 Cal.4th at p. 624 (Lenix) [trial courts are best positioned to consider comparative juror analysis].) Taken at face value, the trial court’s mere observation that “no discriminatory intent is inherent in the explanations, and the reasons appear to be race neutral” (italics added) does not address whether the race-neutral reasons given by the prosecutor were the actual reasons motivating the strikes. The inquiry at Batson's third stage requires more than a determination of inherent or apparent plausibility; it “requires the judge to assess the plausibility of [the prosecutor’s stated] reason in light of all evidence with a bearing on it.” (Miller-El, supra, 545 U.S. at p. 252.) Nothing in the record shows that the trial court conducted the requisite inquiry.
Today’s opinion attempts to fill the gap in two ways. First, it says the trial court’s “assertion that no discriminatory intent was ‘inherent’ in the prosecutor’s explanations is reasonably read as a determination that the court believed them to be true.” (Maj. opn., ante, at p. 1054.) But that reading of the word “inherent” is as strained as it is ironic in light of this court’s own usage of the word in this context. (See Williams, supra, 56 Cal.4th at p. 653 [a prosecutor’s explanation is “ ‘inherently plausible’ ” if it is “not ‘inherently implausible’ ”].) Further, right after the trial court used the word “inherent,” it said “the reasons appear to be race neutral” (italics added). If the trial court had made a determination that the prosecutor’s reasons were in fact true, why did it not just say so and provide its analysis instead of using doubly qualified, conclusory language? It is this court that “parses the [trial] court’s words too closely” (maj. opn., ante, at p. 1054) instead of giving them their plain meaning.
Second, today’s opinion says the trial “court asked for the relevant juror questionnaires, and it presumably reviewed them. No reason appears to conclude the court failed to consider all the factors bearing on the prosecutor’s credibility, including his demeanor, the inherent reasonableness or improbability of his proffered explanations, their plausible basis in accepted trial strategy, the court’s own observation of the relevant jurors’ voir dire, its experience as a trial lawyer and judge in the community, and the common practices of the prosecutor’s office and the individual prosecutor himself.” (Maj. opn., ante, at p. 1054. But cf. Adkins v. Warden (11th Cir. 2013) 710 F.3d 1241, 1254 [“trial court’s personal experience with and opinion about the reputation of the prosecutor” was not a proper consideration at Batson’s third stage because it was “non-record evidence which [the defendant] did not have an opportunity to rebut”].) There is a wide chasm, however, between the absence of reasons to conclude that the trial court did not conduct a proper Batson analysis and the presence of reasons to conclude that it did. (See Snyder, supra, 552 U.S. at p. 479 [reviewing court may not credit juror demeanor as the reason for a strike where the trial court made no “specific *1062 finding on the record concerning [the juror’s] demeanor” and “simply allowed the challenge without explanation”].) If a reviewing court can simply fill the void with a massive pile of presumptions, then we can be assured that many trial courts will continue to deny Batson claims without reasoned explanation. Indeed, we might as well dispense with appellate review in such cases since it is so easy to rationalize a silent record with a cacophony of presumptions.
The court knows we cannot actually do this under Miller-El and Snyder, so its real answer to the problem of unexplained Batson rulings is the following: “we have made clear that ‘the trial court is not required to explain on the record its ruling on a Batson/Wheeler motion. (People v. Reynoso [(2003)] 31 Cal.4th [903,] 919 [3 Cal.Rptr.3d 769, 74 P.3d 852].) “When the prosecutor’s stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings.” (People v. Silva (2001) 25 Cal.4th 345, 386 [106 Cal.Rptr.2d 93, 21 P.3d 769].)’ ([People v. Vines, supra,] 51 Cal.4th 830, 849.)” (Maj. opn., ante, at p. 1054, italics added.) “ ‘ ‘ “[T]he trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor’s race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine.” ’ ” (People v. Stanley [(2006)] 39 Cal.4th [913,] 936 [47 Cal.Rptr.3d 420, 140 P.3d 736].)’ ” (Id. at pp. 1048-1049.)
The swarm of internal quotation marks around the mle stated above indicates that this court has often found it to be a handy tool in rejecting Batson claims. The discussion in part II. below excavates the tenuous origins of this rule in our Batson jurisprudence. Here I focus on how our application of the rule dilutes the proper inquiry at Batson’s third step.
The problem, in a nutshell, is this: Our court routinely holds that so long as the prosecutor’s stated reason for striking a minority juror is (1) inherently plausible and (2) supported by the record, we must presume that the trial court’s denial of a Batson motion, even if rendered without any explicit findings or analysis, was premised on a full inquiry into all the relevant circumstances bearing on the credibility of the prosecutor’s explanation. That presumption, in turn, entitles the trial court’s ruling to deference on appeal. But to say that a prosecutor’s stated reason is inherently plausible is only to say that it is “not ‘inherently implausible.’ ” (Williams, supra, 56 Cal.4th at p. 653.) That is a far cry from evaluating whether the stated reason was likely the actual reason for a particular strike given the totality of relevant circumstances. And to say that a prosecutor’s stated reason is “supported by the record” is only to say that there is some evidence to support the reason or (in an even weaker formulation) that the stated reason is not contradicted by the record. (People v. Reynoso, supra, 31 Cal.4th at p. 929 (Reynoso).) *1063 Again, that is a far cry from inquiring, based on all relevant circumstances, how likely it is that the stated reason was the actual reason for the strike. The Batson inquiry ultimately requires an assessment of likelihoods; it is the defendant’s burden to prove that “it was more likely than not that the challenge was improperly motivated.” (Johnson, supra, 545 U.S. at p. 170.) An explanation can be plausible without being likely, and an explanation can be supported by some evidence or uncontradicted by the record without being likely based on the totality of relevant circumstances. I do not see how the fact that a proffered reason is inherently plausible and supported by the record enables us to presume that the trial court actually reached a decision as to whether it was more likely than not that the proffered reason was pretextual in light of all relevant circumstances.
This analytical gap and related errors are apparent in several aspects of today’s opinion. Consider the court’s discussion of the strike against Prospective Juror M.H. On her juror questionnaire, M.H. indicated that she was a 40-year-old computer consultant with a bachelor’s degree in math and computer science. She was single and had no children. She had formed no opinions about the present case and expressed no hesitations about her ability to follow the court’s instructions and serve as an impartial juror. When asked for her general feelings about the death penalty, M.H. wrote, “I am for the death penalty.” When asked whether the death penalty has been given too often, too seldom, or randomly, M.H. wrote, “I feel the death penalty has been used appropriately. Especially given that some of the defendants have spent years on death row.” M.H. further indicated that her views on the death penalty had not changed in the last few years. M.H. did not support or belong to any victim rights groups; she did not belong to any group advocating either abolition or increased use of the death penalty; she did not have any close friends or relatives who had been arrested or convicted of a crime. M.H. said her views on capital punishment would not cause her to automatically vote for or against the death penalty without considering the aggravating and mitigating evidence presented.
At voir dire, when defense counsel asked whether her support for the death penalty stemmed from “some experience of your own,” M.H. said: “Oh, no, no, not personally. But I figure if someone came to my house and blew my family away, I would flip the switch. But that’s personal, that’s why I believe in it. But I don’t—I wouldn’t sit here and tell this young man, okay, you need it because you killed somebody, I think there [are] also circumstances. But I know if it was my family, I couldn’t honestly say that I wouldn’t be emotional about it.” On further questioning, M.H. confirmed she had no personal experiences related to the death penalty but again said, “if it was me personally and my family, that’s totally different for me.”
*1064 The prosecutor gave the following explanation for striking M.H.: “[M.H.] is single. She has no children. She is younger than the juror I prefer. She is in her 30’s. She is also, her attitude regarding the death penalty was personal and emotional, not philosophical. She was the one who talked about, if it was my family I could understand it. But primarily the reason [is] she is young, single and no children. There [are] no other jurors on the jury presently who fit that pattern.”
In assessing the prosecutor’s explanation, today’s opinion says that M.H.’s statements at voir dire “could give rise to a reasonable concern that her willingness to impose this punishment might be influenced by her degree of direct interest in the case” (maj. opn., ante, at p. 1051) and that the prosecutor “could reasonably be concerned about her ability to give the death penalty fair consideration when a family member was not a victim” (ibid.). The word “could” makes it hard to disagree insofar as one cannot say that the court’s posited reading of M.H.’s remarks is entirely implausible. But even if plausible, is it likely that a reasonable person would have understood M.H.’s statements that way? M.H. clearly stated that her support for the death penalty was unrelated to any personal experience (“Oh, no, no, not personally.”). She wrote on her questionnaire that “I am for the death penalty” and that her view had not changed in the last few years. She further indicated that “I feel the death penalty has been used appropriately. Especially given that some of the defendants have spent years on death row.” It does not seem likely that a person familiar with M.H.’s questionnaire and her full answers at voir dire would have understood her support for the death penalty to be, as the prosecutor put it, “personal and emotional, not philosophical.” M.H.’s remarks simply conveyed that she would have an emotional reaction if her family were murdered (“I would flip the switch”), not that she did not support or could not apply the death penalty in other circumstances.
The court attempts to buttress the prosecutor’s explanation with the following statement; “Moreover, as the Attorney General observes, M.H.’s somewhat testy exchange with defense counsel (‘are you misunderstanding me?’) could also, in combination with the prosecutor’s personal observation of this prospective juror, persuade him her relative youth was a sign of immaturity.” (Maj. opn., ante, at p. 1051.) But the inclusion of this sentence in the court’s Batson analysis is wrong on two counts. First, the prosecutor said one reason he struck M.H. was that “she is young” and “younger than the juror I prefer.” The prosecutor said nothing about “immaturity.” The prosecutor might have treated youth as a proxy for liberal views, compassion for criminal defendants, or something else. We do not know what underlies the prosecutor’s preference, and neither the Attorney General nor this court may shore up a reason that the prosecutor actually” gave with a reason he did not give. (See Miller-El, supra, 545 U.S. at p. 252 [“[A] prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility *1065 of the reasons he gives .... If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.”].) Second, under Snyder, we have no basis to credit “the prosecutor’s personal observation of this prospective juror” (maj. opn., ante, at p. 1051) as part of the basis for the strike because “the record does not show that the trial judge actually made a determination concerning [M.H.’s] demeanor.” (Snyder, supra, 552 U.S. at p. 479.)
Moreover, the court dismisses the import of comparing M.H. to Juror No. 12 on the ground that “Juror No. 12 expressed much stronger views in favor of the death penalty. Nothing indicates the prosecutor was wrong in suggesting that when M.H.’s age, familial status, and death penalty views were considered together, she was unique among the jurors who had been evaluated at the time the prosecutor excused her.” (Maj. opn., ante, at p. 1051.) But recall what the prosecutor actually said in striking M.H.: “[M.H.] is single. She has no children. She is younger than the juror I prefer. She is in her 30’s. She is also, her attitude regarding the death penalty was personal and emotional, not philosophical. She was the one who talked about, if it was my family I could understand it. But primarily the reason [is] she is young, single and no children. There [are] no other jurors on the jury presently who fit that pattern.” The prosecutor begins with his concern that M.H. is young (she was actually 40, not “in her 30’s”), single, and without children. He then discusses M.H.’s death penalty views. At the end, he pivots and prioritizes his opening concern: “But primarily the reason [is] she is young, single and no children. There [are] no other jurors on the jury presently who fit that pattern.” (Italics added.) It may be possible to construe “that pattern” to encompass M.H.’s death penalty views in addition to her age and familial status. But again-, even if such an interpretation is plausible, is it likely that that is what the prosecutor meant? When the prosecutor’s last two sentences are read together, the most natural understanding of his assertion that “There [are] no other jurors on the jury presently who fit that pattern” is that he believed no other jurors were “young, single and no children.” And on this point, the record shows that two seated jurors close in age to M.H. were single and without children; Juror No. 1 (age 45) and Juror No. 12 (age 43).
Even if we were to fold in the prosecutor’s comments about M.H.’s death penalty views as part of “that pattern,” we would have to acknowledge, as discussed above, that those comments offer an unlikely (even if plausible) rendition of the views she expressed. And once that is acknowledged, it seems doubtful to say that “Juror No. 12 expressed much stronger views in favor of the death penalty” than M.H. did. (Maj. opn., ante, at p. 1051.) As to his general feelings about the death penalty, Juror No. 12 wrote on his questionnaire, “I’m for it,” whereas M.H. wrote, “I am for the death penalty.” Juror No. 12 indicated he felt the death penalty is used “too seldom” and *1066 noted, “[t]oo many appeals that take too long”; M.H. said, “I feel the death penalty has been used appropriately. Especially given that some of the defendants have spent years on death row.” Juror No. 12 qualified his views by indicating that “if court proved to me that defendant should be spared death—I might not vote death.” Further, he noted that his ability to serve as an impartial juror might be affected if “defendant said he’d found God and should be spared for that reason.” On her questionnaire, M.H. did not qualify her support for the death penalty in any way. The principal difference between Juror No. 12 and M.H. is that Juror No. 12 wrote on his questionnaire that his cousin-in-law was a fireman who had tried to save the murder victim and that he had already formed an opinion that defendant deserved the death penalty. But we can hardly cite Juror No. 12’s preconception about this case (as distinct from his views about the death penalty in general) as a proper basis for differentiating him from M.H., since we have upheld the trial court’s refusal to excuse Juror No. 12 for cause on the ground that during voir dire he “consistently indicated that he could and would subordinate his views, carefully weigh and consider the aggravating and mitigating evidence as instructed, vote for either death or life without parole as appropriate, and sit fairly in accordance with the juror’s oath.” (Maj. opn., ante, at p. 1045.) Whether there were other differences between Juror No. 12 and M.H. is something we do not know because the trial court, despite defense counsel’s prompting, did not conduct a comparative juror analysis.
In the end, the court finds only that “the prosecutor’s reasons were plausible and, in all essential respects, supported” (maj. opn., ante, at p. 1054) because that is enough under our precedent to entitle the trial court’s unexplained Batson ruling to deference on appeal. As shown above, this approach cannot be reconciled with the high court’s mandate that “in considering a Batson objection, or in reviewing a ruling claimed to be Batson error, all of the circumstances that bear upon the issue of racial animosity must be consulted.” (Snyder, supra, 552 U.S. at p. 478, citing Miller-El, supra, 545 U.S. at p. 239; see Batson, supra, 476 U.S. at p. 94.) Tellingly, today’s opinion nowhere actually says that the trial court or this court has independently determined, based on all relevant circumstances, that it was not more likely than not that the prosecutor’s strikes of the three black prospective jurors were motivated by race. As in Williams, our decision today results in “the denial of defendant’s Batson claim despite the fact that no court, trial or appellate, has ever conducted a proper Batson analysis.” (Williams, supra, 56 Cal.4th at p. 700 (dis. opn. of Liu, J.).)
II.
Although the legal shortcuts that pervade the Batson analysis in today’s opinion are troubling, the reality is that habits of unwarranted deference, *1067 speculative inference, and overreliance on gap-filling presumptions have been entrenched in our Batson jurisprudence for some time now. As I discuss in People v. Harris, supra, 57 Cal.4th at pages 885-886 (conc. opn. of Liu, J.) (Harris), also filed today, this court has found only one instance of unlawful discrimination in jury selection among the 102 cases that have raised Batson claims over the past 20 years, and none among the 59 cases that postdate Miller-El. This improbable record is attributable, at least in part, to the erroneous legal framework that we continue to apply in evaluating Batson claims. In Harris, I discuss the problematic development of our case law on what is required to establish an inference of discrimination at Batson’s first step. (Harris, at pp. 879-882 (conc. opn. of Liu, J.).) Here I trace the development of our erroneous rule of deference at Batson’s third step.
A.
The deferential approach we apply to unexplained Batson rulings was not always a part of our law. In the wake of People v. Wheeler (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748], our state law forerunner of Batson, this court in People v. Hall (1983) 35 Cal.3d 161 [197 Cal.Rptr. 71, 672 P.2d 854] (Hall) emphasized that a trial court, in considering a Wheeler motion, must make “a sincere and reasoned attempt to evaluate the prosecutor’s explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges.” (Id. at pp. 167-168.) We did not clearly define what a trial court must do in order to demonstrate that it had made this inquiry, nor did we connect a trial court’s failure to conduct this inquiry with the level of deference owed on appeal. But we did suggest that a trial court must undertake more than a summary denial if there was some basis for questioning the prosecutor’s reasons. In Hall, we evaluated the prosecutor’s explanations and found that some were “suggestive of bias” and “demanded further inquiry on the part of the trial court.” (Id. at pp. 168-169.) “Yet the trial court apparently considered itself bound to accept all of the prosecutor’s explanations at face value, expressing the view that group bias is shown only when a prosecutor declares an intent to exclude all members of an ethnic group from the jury. Such abdication is inconsistent with the court’s obligations under Wheeler, and on authority of that case must be held to constitute error requiring reversal.” (Id. at p. 169, fn. omitted.)
In People v. Turner (1986) 42 Cal.3d 711 [230 Cal.Rptr. 656, 726 P.2d 102] (Turner), we applied Hall’s requirement that trial courts make a “sincere and reasoned attempt to evaluate the prosecutor’s explanation” for striking a minority juror (Hall, supra, 35 Cal.3d at p. 167). The trial court in Turner had denied defendant’s Batson motion without comment. We observed that “the *1068 prosecutor’s explanations were either implausible or suggestive of bias. They therefore ‘demanded further inquiry on the part of the trial court’ ([Hall,] at p. 169), followed by a ‘sincere and reasoned’ effort by the court to evaluate their genuineness and sufficiency in light of all the circumstances of the trial (id., at p. 167, italics added). Each step is ‘imperative, if the constitutional guarantee is to have real meaning’ (ibid.), [f] We conclude that ... the prosecution failed to sustain its burden of showing that the challenged prospective jurors were not excluded because of group bias [citation], and as in Hall the court failed to discharge its duty to inquire into and carefully evaluate the explanations offered by the prosecutor [citation].” (Turner, at p. 728.) On that basis, the court reversed the capital conviction. (Ibid.)
We found reversible error on similar grounds in three subsequent capital cases, all without dissent. In People v. Snow (1987) 44 Cal.3d 216 [242 Cal.Rptr. 477, 746 P.2d 452], the court, in a unanimous opinion by Chief Justice Lucas, determined that “it strongly appears that the trial judge . . . simply accepted at face value the prosecutor’s denials of group bias, without making any ‘sincere and reasoned attempt’ to evaluate the prosecutor’s motives. Under Hall, ‘[s]uch abdication is inconsistent with the court’s obligations under Wheeler . . . .’ ([Hall, supra,] 35 Cal.3d at p. 169.)” (Id. at p. 226.) Similarly, People v. Fuentes (1991) 54 Cal.3d 707 [286 Cal.Rptr. 792, 818 P.2d 75] (Fuentes) held that the trial court failed to conduct “a truly ‘reasoned attempt’ to evaluate the prosecutor’s explanations” because it did not “address the challenged jurors individually to determine whether any one of them has been improperly excluded.” (Id. at p. 720.) Notably, the court in Fuentes “reemphasize[d] the trial court’s role in making an adequate record when dealing with a Wheeler motion. Notwithstanding the deference we give to a trial court’s determinations of credibility and sincerity, we can only do so when the court has clearly expressed its findings and rulings and the bases therefor.” (Id. at p. 717, fn. 5, italics added.) A decade later, in People v. Silva (2001) 25 Cal.4th 345 [106 Cal.Rptr.2d 93, 21 P.3d 769] (Silva), we observed that the trial court had failed to probe discrepancies between the prosecutor’s stated reasons and the record of voir dire, and we held that “[o]n this record, we are unable to conclude that the trial court met its obligations to make ‘a sincere and reasoned attempt to evaluate the prosecutor’s explanation’ ([Hall, supra, 35 Cal.3d at pp. 167-168]) and to clearly express its findings ([Fuentes, at p. 716, fn. 5]).” (Silva, at p. 385.)
B.
As it turns out, Silva now stands as the sole instance during the past 20 years in which this court has found a Batson error. An early sign of erosion of Hall’s “sincere and reasoned” evaluation requirement appeared in People v. Johnson (1989) 47 Cal.3d 1194 [255 Cal.Rptr. 569, 767 P.2d 1047], where a *1069 divided court accorded deference to the trial court’s summary and unexplained ruling even though there was some reason to question the prosecutor’s reasons. Justice Mosk, joined by Justice Broussard, observed in dissent that the trial court, instead of actually inquiring into the prosecutor’s explanations, simply said that the prosecutor had stated his reasons for striking eight minority jurors and then “continued its oral ruling with a rambling statement” at best implying that the stated reasons were facially neutral, not that they were “bona fide.” (Id. at pp. 1289-1290 (dis. opn. of Mosk, J.).) But the court, after criticizing the dissent for engaging in comparative juror analysis and for questioning the plausibility of some of the prosecution’s explanations, emphasized the deference owed to the trial court: “Here an experienced trial judge saw and heard the entire voir dire proceedings by which defendant’s jury was selected. The record indicates he was aware of his duty under Wheeler to be sensitive to the manner in which peremptory challenges were used. He found no improper use of the peremptory challenges by the prosecutor. Under these circumstances we see no good reason to second-guess his factual determination.” (Id. at p. 1221.)
Thereafter, the court cited People v. Johnson in two cases upholding what were essentially summary denials of Batson claims. People v. Cummings (1993) 4 Cal.4th 1233 [18 Cal.Rptr.2d 796, 850 P.2d 1] explained that “[t]he prosecutor offered adequate justification, unrelated to group bias, for the exercise of peremptory challenges. [Citations.] It was not necessary for the court to make additional inquiry. There is no basis in the record for the assertion that the court failed to scrutinize the prosecutor’s reasons to determine if they were pretextual.” (Id. at p. 1282.) And the court in People v. Jackson (1996) 13 Cal.4th 1164 [56 Cal.Rptr.2d 49, 920 P.2d 1254] said that “Wheeler does not require the trial court to conduct further inquiry into the prosecutor’s race-neutral explanations if, as here, it is satisfied from its observations that any or all of them are proper.” (Id. at p. 1198.)
The court in Silva attempted to reconcile cases like Johnson, Cummings, and Jackson with Hall’s “sincere and reasoned” evaluation requirement as well as the requirement that the trial court “clearly express [] its findings and rulings and the bases therefor” (Fuentes, supra, 54 Cal.3d at p. 717, fn. 5). On its facts, Silva was a straightforward case. The prosecutor all but announced at the outset of jury selection that he planned to discriminate on the basis of race because a previous hung jury in the penalty phase had divided on racial lines. (Silva, supra, 25 Cal.4th at pp. 375-376.) He struck five Hispanic jurors and, when asked to explain, gave reasons that were directly contradicted by the record. (Id. at pp. 379-381.) The trial court nevertheless denied the defendant’s motion without probing “the obvious gap” between the prosecutor’s reasons and the record. (Id. at p. 385.) This court reversed the death verdict. (Id. at p. 386.)
*1070 In a critical paragraph, the court in Silva said; “Although we generally '‘accord great deference to the trial court’s ruling that a particular reason is genuine,’ we do so only when the trial court has made a sincere and reasoned attempt to evaluate each stated reason as applied to each challenged juror. [Citations.]” (Silva, supra, 25 Cal.4th at pp. 385-386.) This principle, echoing Fuentes and Hall, was the ground on which Silva was decided. (See Silva, at pp. 385 [“On this record, we are unable to conclude that the trial court met its obligations to make ‘a sincere and reasoned attempt to evaluate the prosecutor’s explanation’ ([Hall, supra, 35 Cal.3d at pp. 167-168]) and to clearly express its findings ([Fuentes, supra, 54 Cal.3d at p. 716, fn. 5]).”].) However, the court in Silva went on to add the following two sentences: “When the prosecutor’s stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings. But when the prosecutor’s stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient.” (Silva, at p. 386.) The second of these two sentences addressed the circumstances in Silva. The first sentence, however, was dicta; the court had no occasion in Silva to decide what inquiry or findings a trial court must make when a prosecutor’s stated reasons are inherently plausible and supported by the record. Nevertheless, these two sentences have come to comprise the rule that crucially qualifies the trial court’s obligation to make a sincere and reasoned attempt to evaluate the prosecutor’s explanations at Batson’s third stage.
Two years later, the court in Reynoso turned Silva’s dicta into doctrine. In that case involving two Hispanic defendants, the prosecutor exercised only four peremptory challenges, the last two of which were directed at the only two Hispanic prospective jurors then on the panel. (Reynoso, supra, 31 Cal.4th at p. 909.) After the trial court found that the defense had established a prima facie case of discrimination, the prosecutor explained that he struck one of the two Hispanic panelists, Elizabeth G., because she was a “ ‘customer service representative’ ” and therefore “ ‘did not have enough educational experience,’ ” and because “ ‘[i]t seemed like [Elizabeth G.] was not paying attention to the proceedings and . . . that she was not involved in the process.’ ” (Id. at p. 911.) The trial court immediately ruled as follows: “ ‘And I accept those reasons as being not based upon race or ethnicity. And I don’t find that there has been a violation of Wheeler and that the—there was not a systematic exclusion of a recognized ethnic group, i.e., Hispanics in this case. So the motion is denied.’ ” (Ibid.) Defense counsel then argued that nothing in Elizabeth G.’s demeanor justified the strike. (Id. at pp. 911-912.) The trial court did not comment further except to note that the defense had also struck one Hispanic panelist. (Id. at pp. 912-913.)
*1071 This court, in a four-to-three decision, upheld the trial court’s ruling. While acknowledging that a trial court “ ‘must make “a sincere and reasoned attempt to evaluate the prosecutor’s explanation . . . .” (People v. Hall[, supra,] 35 Cal.3d 161, 167-168),’ ” the court in Reynoso said that “in fulfilling that obligation, the trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor’s race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine. This is particularly true where the prosecutor’s race-neutral reason for exercising a peremptory challenge is based on the prospective juror’s demeanor, or similar intangible factors, while in the courtroom.” (Reynoso, supra, 31 Cal.4th at p. 919.) The court went on to highlight the dicta from Silva that “ ‘[w]hen the prosecutor’s stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings.’ ” (Reynoso, at p. 923, quoting Silva, supra, 25 Cal.4th at p. 386, italics added by Reynoso.)
The court then determined that the trial court had satisfied its obligations and that its ruling was entitled to deference. The court acknowledged that the prosecutor’s first reason for striking Elizabeth G.—her lack of “ ‘educational experience’ ”—was “of questionable persuasiveness,” at least “when viewed objectively.” (Reynoso, supra, 31 Cal.4th at p. 924.) But her “answers to the general questions” did confirm that she worked as a customer service representative. (Ibid.) Noting that she also had “no prior jury experience and no past contact with the criminal justice system”—facts not mentioned by the prosecutor in explaining this strike—the court concluded that a prosecutor “arguably could conclude in sincerity” that a prospective juror like Elizabeth G. “would not be the best type of juror for the case.” (Id. at pp. 924-925.) The court justified this conclusion with additional speculation: “Such a determination might further be supported by a myriad of factors readily observable by those present in the courtroom, but not by those who are reviewing the case from a cold transcribed record on appeal.” (Id. at p. 925.)
As to the prosecutor’s second reason for striking Elizabeth G.—that she appeared inattentive—the court acknowledged that “the trial court made no attempt to clarify or probe the prosecutor’s reasons for finding Elizabeth G.’s demeanor while in the jury box unsuited to jury service.” (Reynoso, supra, 31 Cal.4th at p. 926.) “But,” the court said, “the trial court did expressly accept the prosecutor’s race-neutral reasons for the peremptory challenge to Elizabeth G., finding them sincere and genuine. Since the trial court was in the best position to observe the prospective jurors’ demeanor and the manner in which the prosecutor exercised his peremptory challenges, the implied finding, that the prosecutor’s reasons for excusing Elizabeth G., including the demeanor-based reason, were sincere and genuine, is entitled to ‘great *1072 deference’ on appeal. [Citations.]” (Ibid., italics added.) The court added that it found nothing “in the record to directly contradict” the trial court’s ruling and noted that the prosecutor accepted the jury “74 times with Elizabeth G. seated in the jury box.” (Ibid.)
Reynoso went on to state the following rule, which is now boilerplate language in our case law: “Where ... the trial court is fully apprised of the nature of the defense challenge to the prosecutor’s exercise of a particular peremptory challenge, where the prosecutor’s reasons for excusing the juror are neither contradicted by the record nor inherently implausible (Silva, supra, 25 Cal.4th at p. 386), and where nothing in the record is in conflict with the usual presumptions to be drawn, i.e., that all peremptory challenges have been exercised in a constitutional manner, and that the trial court has properly made a sincere and reasoned evaluation of the prosecutor’s reasons for exercising his peremptory challenges, then those presumptions may be relied upon, and a Batson/Wheeler motion denied, notwithstanding that the record does not contain detailed findings regarding the reasons for the exercise of each such peremptory challenge.” (Reynoso, supra, 31 Cal.4th at p. 929.)
Justice Kennard, joined by Justice Werdegar and Justice Moreno, dissented, Justice Kennard observed that in “[bjrushing . . . aside” the fact that the trial court had ruled on the Batson motion without questioning the prosecutor, making particularized findings, stating the proper legal standard, or addressing the factual disputes raised by the defense, the court had “indulgefd] a presumption that both the prosecutor and the trial court acted properly, thereby adopting a standard of appellate review that effectively insulates discriminatory strikes from meaningful scrutiny at both the trial and appellate stages.” (Reynoso, supra, 31 Cal.4th p. 930 (dis. opn. of Kennard, J.).) According to Justice Kennard, the prosecutor’s reliance on Elizabeth G.’s employment as a customer service representative was the sort of implausible explanation that required further investigation and explicit findings, and the trial court made no effort to resolve the disputed claim that Elizabeth G. had not been paying attention. (Id. at pp. 931-932). “Appellate deference is unwarranted where, as here, the appellate record supplies many reasons to doubt that the trial court even made a credibility determination, much less a determination resulting from a sincere and reasoned effort.” (Id. at p. 935.)
Justice Moreno authored a separate dissent joined by Justice Kennard and Justice Werdegar. After observing that the record did not support either of the prosecutor’s stated reasons for striking Elizabeth G. (Reynoso, supra, 31 Cal.4th at pp. 940-942 (dis. opn. of Moreno, J.)), Justice Moreno concluded: “Whereas Silva held that a trial court’s obligation to inquire was triggered by a race-neutral excuse unsupported by the record, the majority today holds that such an obligation is triggered only where such an excuse is contradicted by *1073 the record. However, where the unexamined race-neutral excuse belies common sense or is contradicted by defense counsel, we cannot presume that the prosecutor has exercised the peremptory challenge in a constitutional manner.” (Id. at p. 943; see id. at p. 940 [“today, without a sound basis in logic or law, a majority of this court elevates Silva['s] ‘unsupported by the record’ standard to a much stricter ‘contradicted by the record’ standard . . .”].)
The rule set forth in Reynoso, which departed in essential respects from Silva, Fuentes, and Hall, effectively put this court on a glide path toward affirming unexplained trial court rulings denying Batson motions. As demonstrated by our repeated quotation and application of Reynoso's rule in case after case, it has been easy for the court to find a prosecutor’s stated reasons to be inherently plausible and either supported or not contradicted by the record, and then to defer to the trial court’s ruling on that basis. (See, e.g., maj. opn., ante, at pp. 1048-1049, 1053-1053; Williams, supra, 56 Cal.4th at pp. 653-659; People v. Vines, supra, 51 Cal.4th at pp. 849-850; People v. Watson (2008) 43 Cal.4th 652, 670-673 [76 Cal.Rptr.3d 208, 182 P.3d 543]; People v. Guerra (2006) 37 Cal.4th 1067, 1103 [40 Cal.Rptr.3d 118, 129 P.3d 321].)
C.
This court has never reconsidered Reynoso in light of the high court’s decisions in Miller-El and Snyder, even though those authorities call into serious question our rule of deference to unexplained Batson rulings. Contrary to Reynoso, the high court in Snyder squarely held that a reviewing court may not accept a prosecutor’s demeanor-based explanation-for striking a minority juror in the absence of a trial court finding as to the juror’s demeanor, at least where defense counsel has disputed the issue. (See Snyder, supra, 552 U.S. at p. 479 [“Rather than making a specific finding on the record concerning Mr. Brooks’ demeanor, the trial judge simply allowed the challenge without explanation .... [W]e cannot presume that the trial judge credited the prosecutor’s assertion that Mr. Brooks was nervous.”].)
More broadly, Miller-El and Snyder elucidate by example the careful and thorough inquiry required at Batson's third step, and those decisions make clear that the totality of circumstances relevant to evaluating the credibility of a prosecutor’s stated reasons for striking a minority juror includes comparative juror analysis. (See Snyder, supra, 552 U.S. at pp. 479-485; Miller-El, supra, 545 U.S. at pp. 240-266.) Our precedent indulges the presumption that a trial court has conducted this rigorous inquiry, despite no indication in the record that it did, so long as the prosecutor’s stated reason is inherently plausible and not contradicted by the record. However, by packing into a presumption the entire inquiry into “the plausibility of [the prosecutor’s *1074 stated] reason in light of all evidence with a bearing on it” (Miller-El, supra, 545 U.S. at p. 252), we have “adopt[ed] a standard of appellate review that effectively insulates discriminatory strikes from meaningful scrutiny at both the trial and appellate stages.” (Reynoso, supra, 31 Cal.4th at p. 930 (dis. opn. of Kennard, J.).) Our rule of deference to summary Batson rulings all but assumes the answer to the question that Batson analysis is designed to address.
As today’s opinion demonstrates, the application of this rule of deference tends to foster judicial rationalization of a prosecutor’s strikes in a manner that Batson does not permit. It is all too tempting for a reviewing court, in speculating on the possible dynamics in the courtroom, to posit reasons in support of a trial court’s Batson ruling that the prosecutor did not give. As noted, the court in this case relies on a four-word comment by M.H. to defense counsel (“are you misunderstanding me?”) to suggest that the prosecutor may have struck M.H. because “her relative youth was a sign of immaturity,” even though the prosecutor cited only M.H.’s youth, not her immaturity, as a reason for the strike. (Maj. opn., ante, at p. 1050; see ante, at pp. 1064-1065.) And in Reynoso, the court reasoned that the fact that Elizabeth G. had “no prior jury experience” and “no prior contact with the criminal justice system” could support the sincerity of the prosecutor’s strike, even though the prosecutor never mentioned those aspects of Elizabeth G.’s background in explaining the strike. (Reynoso, supra, 31 Cal.4th at p. 925.) These maneuvers violate the high court’s admonition that adjudication of a Batson challenge “does not call for a mere exercise in thinking up any rational basis.” (Miller-El, supra, 545 U.S. at p. 252.) A prosecutor’s strike must “stand or fall on the plausibility of the reasons he gives,” regardless of whether “a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.” (Ibid.)
It is no doubt true that “a myriad of factors readily observable by those present in the courtroom, but not by those who are reviewing the case from [a] cold transcribed record on appeal,” may properly inform a Batson ruling. (Reynoso, supra, 31 Cal.4th at p. 925.) For this reason, the trial court is in the best position to make the all-things-considered judgment required at Batson’s third stage. When a trial court has conducted the requisite analysis and has articulated the findings that inform its Batson ruling, the principle of judicial restraint fully supports the application of deference on appeal. But when the “myriad of factors readily observable by those present in the courtroom” is simply left to judicial speculation on appeal, the application of deference does not reflect restraint at all. It is instead an active imagining of inquiries and analyses that may or may not have occurred. Like my colleagues, I am confident that our trial courts approach the evaluation of Batson claims with competence and sincerity. But jury selection can be a complex process, and in the context of a particular strike, a trial court may have “stopped taking *1075 notes” (Williams, supra, 56 Cal.4th at p. 651), it may have neglected to consult the record of voir dire (id. at p. 716 (dis. opn. of Liu, J.)), it “may not have recalled [a juror’s] demeanor” (Snyder, supra, 552 U.S. at p. 479), it may have declined to engage in comparative juror analysis despite the urging of counsel (maj. opn., ante, at pp. 1047-1048), it may have applied an erroneous legal standard in assessing a Batson claim (Reynoso, at pp. 933-934 (dis. opn. of Kennard, J.), or it may have made an unreasonable judgment under the totality of circumstances (Miller-El, supra, 545 U.S. at p. 266). Filling these gaps on appeal with speculation and presumptions is not an exercise of judicial restraint. It is also counterproductive. Our “don’t ask, don’t tell” approach to appellate review-—whereby this court does not ask, when trial courts do not tell, the reasons for their Batson mlings—erodes the incentive for trial courts to articulate their findings and analysis, thereby heightening the frequency with which reviewing courts must resolve Batson claims on the basis of a paper record.
More fundamentally, in light of what decades of research have revealed about the stubborn role of race in jury selection (see Harris, supra, 57 Cal.4th at pp. 887-889 (conc. opn. of Liu, J.) [reviewing studies]), it seems empirically suspect—if not downright unfair—to apply a rule of deference whose practical effect is to hold that what a trial court leaves unsaid in denying a Batson claim will be construed on appeal in favor of the prosecution. The Batson inquiry ultimately focuses on the subjective genuineness of the prosecutor’s stated reasons. It is a motive test, and short of a naked admission, it can be difficult to determine a person’s motive with reasonable certainty. The law properly addresses this uncertainty by placing on the defendant the burden to prove it was more likely than not that the prosecutor’s strike was motivated by race. The proof standard and the allocation of the burden to the defendant can be decisive in a close case, as I show below. (See post, at pp. 1076-1078.) But the law should not address the uncertainty by construing against the defendant all that we cannot know—because the trial court provided no findings or analysis—about what actually happened in the courtroom.
Our earlier precedent held trial courts to their obligation to make “a sincere and reasoned attempt to evaluate the prosecutor’s explanation” (Hall, supra, 35 Cal.3d at p. 167) and underscored “the trial court’s role in making an adequate record” by declaring that “[notwithstanding the deference we give to a trial court’s determinations of credibility and sincerity, we can only do so when the court has clearly expressed its findings and rulings and the bases therefor” (Fuentes, supra, 54 Cal.3d at p. 717, fn. 5). Many trial courts do articulate the grounds for their Batson rulings, and it is entirely appropriate to make appellate deference contingent on this practice. For what is at issue is not some minor legal technicality, but a vital inquiry that implicates the most basic notions of fairness in our justice system. The United States Supreme *1076 Court has repeatedly emphasized the three-dimensional harm that results from racial discrimination in jury selection. The defendant is deprived of his “right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria.” (Batson, supra, 476 U.S. at pp. 85-86.) The excluded juror “suffers a profound personal humiliation heightened by its public character” and loses “a significant opportunity to participate in civic life.” (Powers v. Ohio (1991) 499 U.S. 400, 413-414, 409 [113 L.Ed.2d 411, 111 S.Ct. 1364].) And “[t]he harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice.” (Batson, at p. 87; see Miller-El, supra, 545 U.S. at p. 238 [“[T]he very integrity of the courts is jeopardized when a prosecutor’s discrimination ‘invites cynicism respecting the jury’s neutrality,’ [citation], and undermines public confidence in adjudication [citations].”]; Powers, at p. 412.) In light of these potential harms, it does not seem too much to insist that trial courts or, as a fail-safe, reviewing courts demonstrate a truly reasoned effort to evaluate a defendant’s assertion of this important right in light of all the circumstances bearing on it.
III.
Because we cannot defer to the trial court’s Batson ruling in this case, we must independently examine the record to determine whether defendant has shown that it was more likely than not that one or more of the prosecutor’s strikes were motivated by race.
The record shows that the prosecutor struck all three black prospective jurors in the venire. This fact properly raises a suspicion but does not by itself prove discrimination. The significance of the pattern is attenuated in this case by the fact that the prosecutor gave credible reasons for striking two of the black jurors, P.F. and L.P. In her questionnaire and voir dire, P.F. consistently said she viewed the death penalty as an appropriate punishment for a person who has shown “a pattern” of violence or disregard for life. When the prosecutor asked P,E if her focus on a pattern of behavior “wasn’t something exclusive,” she agreed. But P.F., when using her own words, did not voice support for the death penalty in terms other than as punishment for “a pattern” of behavior, and no other seated or alternate juror expressed similar views. I thus conclude that the prosecutor’s concern that P.F. had said “in her questionnaire [that the death penalty] was appropriate only where there was a pattern of violent conduct” was, in all likelihood, not pretextual. And I reach the same conclusion about the prosecutor’s strike of L.P. based on his concerns that “[s]he is a social worker,” a fact unique to L.P. as compared to the seated and alternate jurors, and that “she couldn’t vote for the death *1077 penalty unless ... the facts were proved beyond a shadow of a doubt...” a natural understanding of L.P.’s remarks at voir dire.
Having found it improbable that the prosecutor struck P.F. or L.P. because of their race, I would examine the prosecutor’s strike of M.H. without any suspicion arising from the fact that it occurred as part of an apparent pattern. Still, the strike appears suspicious because, as noted, the prosecutor’s characterization of M.H.’s attitude regarding the death penalty as “personal and emotional, not philosophical” is a strained interpretation of what she said at voir dire, especially when considered in light of the views she indicated on her questionnaire. (Ante, at pp. 1063-1064.) Further, with respect to the prosecutor’s concern that “she is young, single and no children,” his claim that “no other jurors ... fit that pattern” appears questionable in light of the fact that two seated jurors, Juror No. 1 and Juror No. 12, were single, childless, and close in age to M.H. (Ante, at pp. 1064-1065.) Juror No. 12’s general views in favor of the death penalty were not very different from M.H.’s (ante, at p. 1065), and Juror No. 1 said on her questionnaire that the death penalty should be used “[ojnly in extreme cases,” though during voir dire she said she had no particular case in mind and “it would depend on everything.”
At the same time, comparative juror analysis reveals an important fact that supports the prosecutor’s credibility. Besides M.H., three prospective jurors struck by the prosecutor were young, single, and without children: K.D. (age 28), A.L. (age 20), and T.F. (age 33). In addition, all three indicated support for the death penalty. K.D. wrote on her questionnaire that the death penalty “should be imposed” in appropriate cases, and she said during voir dire that she would be able to follow the court’s instructions and vote for death if the aggravating factors outweighed the mitigating factors. A.L. wrote that she had no strong “personal feelings about the law” and would “do what [she was] supposed to,” and affirmed during voir dire that she could personally vote to impose the death penalty. T.F. stated that he believed the death penalty was the “appropriate and just punishment” in certain cases, and that he would “disagree” with the Legislature if it were to get rid of it. The fact that the prosecutor stmck three other young, single, and childless prodeath penalty jurors lends credence to the prosecutor’s statement, in explaining why he struck M.H., that “primarily the reason [is] she is young, single and no children” (italics added). By indicating that the prosecutor did not single out M.H. among all other prospective jurors possessing those characteristics, the prosecutor’s strikes of K.D., A.L., and T.F. tend to diminish the inference of discrimination arising from the fact that the prosecutor did not also strike Juror No. 1 and Juror No. 12, both of whom were slightly older than M.H.
Ultimately, the prosecutor’s strikes of K.D., A.L., and T.F. make the possibility that he struck M.H. primarily because she was young, single, and *1078 without children at least as likely as the possibility that he struck M.H. because of her race. Based on an independent examination of the record, I conclude that defendant has not carried his burden of proving that it was more likely than not that the prosecutor struck M.H. because of her race. Accordingly, defendant’s Batson claim must be rejected.
In all other respects, I join the court’s opinion affirming the judgment.
Appellant’s petition for a rehearing was denied October 2, 2013, and the opinion was modified to read as printed above.